Pender Farm Dev., LLC v. NDCO, LLC, 2019 NCBC 67.

STATE OF NORTH CAROLINA

PENDER COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 446

PENDER FARM DEVELOPMENT,
LLC,

        Plaintiff and
           Counterclaim
           Defendant,

v.

NDCO, LLC,

        Defendant, Counterclaim
           Plaintiff, and Third-
           Party Plaintiff,

v.

RAIFORD TRASK, III,

        Third-Party Defendant.

**ORDER AND OPINION ON NDCO,
LLC'S MOTION PURSUANT TO
RULE 56(d)**

1.    **THIS MATTER** is before the Court on Defendant/Counterclaimant and Third-Party Plaintiff NDCO, LLC's ("NDCO") motion under Rule 56(d) of the North Carolina Rules of Civil Procedure (the "Rule(s)" or "North Carolina Rule(s)"), filed on October 8, 2018 (the "Rule 56(d) Motion"). (*See* ECF No. 88.) NDCO's Rule 56(d) Motion is brought in connection with its motion for summary judgment, (ECF No. 88), which came on for hearing before the Court on September 18, 2019 along with separate motions for summary judgment filed by Plaintiff/Counterclaim Defendant Pender Farm Development, LLC ("PFD") and Third-Party Defendant Raiford Trask, III ("Trask") (together, "PFD/"Trask"), (ECF Nos. 90, 92) (all three summary

judgment motions hereinafter, the "Cross-Motions"). In the Rule 56(d) Motion, NDCO requests that the Court examine the pleadings and evidence before it on the Cross-Motions and ascertain what material facts exist without substantial controversy and what facts are actually and in good faith controverted. In the interests of judicial efficiency, the Court enters this Order and Opinion on NDCO's Rule 56(d) Motion separately and prior to its written order and opinion on the Cross-Motions.

*Wyrick Robbins Yates & Ponton LLP, by Benjamin N. Thompson and Samuel A. Slater, for Plaintiff/Counterclaim Defendant Pender Farm Development, LLC and Third-Party Defendant Raiford Trask, III.*

*Shipman & Wright, LLP, by Gary K. Shipman and James T. Moore, for Defendant/Third-Party Plaintiff NDCO, LLC.*

Robinson, Judge.

## I. INTRODUCTION AND PROCEDURAL HISTORY

2. This case arises out of a dispute between the two members of a limited liability company, Pender 1164, LLC ("Pender 1164"), that was formed for the purpose of owning and developing approximately 1,164 acres of real property located in Pender County, North Carolina. The business relationship between PFD and NDCO, which each own a fifty-percent interest in Pender 1164, is governed by a First Amendment to and Restatement of Operating Agreement of Pender 1164, LLC (the "Amended Operating Agreement"). This Amended Operating Agreement, and the obligations of the parties with respect to the development of the property owned by Pender 1164, is at the heart of the parties' dispute.

3. The Rule 56(d) Motion is brought in connection with the Cross-Motions and seeks an order that narrows the issues for trial in the event that this case is not summarily adjudicated based on the Cross-Motions. In order for the Court to properly undertake the process requested by NDCO, the Court entered a Briefing Order on January 24, 2019 requiring NDCO to file a list of all material facts NDCO contends exist without substantial controversy, with citations to the record. (Briefing Order ¶ 6(a), ECF No. 126 ["Briefing Order"].) The Briefing Order also required PFD/Trask to file any response to NDCO's list of uncontroverted facts within twenty-three (23) days setting forth whether they agreed with NDCO's assessment of the uncontroverted facts, and if not, what PFD/Trask contend the record shows as to which material facts are actually and in good faith controverted. (Briefing Order ¶ 6(b).)

4. Thereafter, on February 23, 2019, NDCO filed a Statement of Uncontroverted Facts, (ECF No. 127), which cited to documents in the record that had been stricken by the Court, (*see* ECF No. 99). The Court, therefore, entered a subsequent order on March 11, 2019 requiring NDCO to refile on or before April 10, 2019 a revised statement of uncontroverted facts with record citations to documents properly before the Court. (*See* ECF No. 134.)

5. In compliance with the Court's March 11, 2019 Order, on April 10, 2019, NDCO filed its Revised Statement of Uncontroverted Facts. (ECF No. 136.) On May 7, 2019, PFD/Trask filed their Responses to NDCO LLC's Revised Statement of Uncontroverted Facts. (ECF No. 137.) After several delays, the Court held a hearing

on the Cross-Motions and the Rule 56(d) Motion on September 18, 2019, at which all parties were represented by counsel. The 56(d) Motion is ripe for determination.

## II. LEGAL STANDARD

6. In the event that summary judgment is not rendered on a whole case, the trial court may nonetheless narrow the issues for trial by setting forth in an order which material facts are undisputed in the record and therefore deemed established for trial. N.C.G.S. § 1A-1, Rule 56(d). Specifically, Rule 56(d) provides:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established.

7. Because Rule 56(d) is triggered by the filing of a motion for summary judgment, and notwithstanding Rule 56(d)'s use of the term "without substantial controversy[,]" the normal summary judgment standards apply. *See State ex rel. Edmisten v. Challenge, Inc.*, 71 N.C. App. 575, 579, 322 S.E.2d 658, 660 (1984) (considering a motion brought pursuant to Rule 56(d) and stating that the burden is on the moving party). The purpose of Rule 56(d) "is to reduce the issues in a case to avoid a protracted trial on undisputed facts[.]" G. Gray Wilson, *North Carolina Civil Procedure Vol. II*, § 56-14 (3d ed. 2007). Notwithstanding that the burden is on the moving party to demonstrate which facts are uncontroverted, the nonmoving party

cannot show that a fact "is in good faith controverted" by a broad, declarative statement to that effect without reference to the record. *See Challenge, Inc.*, 71 N.C. App. at 579–80, 322 S.E.2d at 660–61.

8.      Rule 56(d) is a rarely used device in our trial courts. Wilson, *supra*, at § 56-14 ("[T]he procedure involved is so cumbersome that it is rarely utilized by the trial bench. Trying to get counsel to concede areas of the case that are not in dispute is a difficult if not unrealistic task.") As a result, there is very little case law in North Carolina guiding the trial court as to the role it must play in deciding a motion under Rule 56(d).

9.      Nonetheless, at least one appellate court decision, *State ex. rel. Edmisten v. Challenge, Inc.*, serves as a useful guide for a trial court confronted with a party's request under Rule 56(d). In *Challenge*, the plaintiff moved for partial summary judgment on certain issues and also requested that the trial court ascertain what material facts existed without substantial controversy under Rule 56(d). *Id.* at 577–78, 322 S.E.2d at 659. The trial court initially denied both motions but specified that the denial of the Rule 56(d) motion was without prejudice. *Id.* at 578, 322 S.E.2d at 659.

10.      Thereafter, the plaintiff filed a written motion setting forth thirty-three (33) separate material facts which it believed were uncontroverted. *Id.* At the hearing on the motion, the defendants asserted that twenty-one (21) of the plaintiff's "uncontroverted" facts were actually in controversy but failed to provide explanation or record citations to support their position. *Id.* The trial court ordered the

defendants to supplement their response to the plaintiff's motion with information as to which portions of each matter they contended were converted. *Id.* at 578, 322 S.E.2d at 660. The defendants complied with the trial court's order, and based upon the information provided by the parties, the trial court entered an order finding that all statements of facts listed in the plaintiff's Rule 56(d) motion were uncontroverted and deemed established for purposes of trial. *Id.*

11.    The *Challenge* defendants appealed, arguing, in part, that the trial court erred by ordering the defendants to submit documents to the court rebutting the plaintiff's list of uncontroverted facts. *Id.* at 578–79, 322 S.E.2d at 660. On appeal, the Court of Appeals affirmed the trial court's ruling, concluding that, in order for the trial judge to "perform his duty under Rule 56(d)," he properly asked the defendants to "come forth and provide the [trial] court information as to which portion of each matter is in good faith controverted." *Id.* at 579, 322 S.E.2d at 660. The Court of Appeals noted that the trial court's directive did not require the defendants to assume any burden of proof or produce additional evidence, but merely gave the defendants an opportunity to further assert which facts were actually controverted, which in turn allowed the trial court to reach a ruling consistent with Rule 56(d). *Id.* at 579–80, 322 S.E.2d at 660–61.

12.    *Challenge* therefore instructs that, under Rule 56(d), trial courts may order a moving party to prepare a statement of uncontroverted facts, and thereafter provide the nonmoving party an opportunity to respond to that statement. The trial court then has the benefit of the parties' arguments as to any facts each side claims to be

uncontroverted, thereby assisting the trial court in narrowing the issues for trial, if possible.

13. The Court also finds instructive federal court treatment of Federal Rule 56(g), which contains language similar to North Carolina Rule 56(d) and provides a similar opportunity for the court to narrow issues before trial.[1] Federal Rule 56(g) provides: "[i]f the court does not grant all the relief requested by the motion [for summary judgment], it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

14. The Advisory Committee Notes on the 2010 Amendments to the Federal Rules of Civil Procedure make clear that this subsection:

> applies when the court does not grant all the relief requested by a motion for summary judgment. It becomes relevant only after the court has applied the summary-judgment standard carried forward in subdivision (a) to each claim, defense, or part of a claim or defense, identified by the motion. *Once that duty is discharged, the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute.*
> [. . .]
> If it is readily apparent that the court cannot grant all the relief requested by the motion, *it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial.* Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

---

[1] While this Court is not bound by the Federal Rules of Civil Procedure, or their interpretation, the North Carolina Court of Appeals has "long held that federal decisions interpreting the federal rules [of Civil Procedure] are persuasive when interpreting similar state rules." *Tetra Tech Tesoro, Inc. v. JAAAT Tech. Servs., LLC*, 250 N.C. App. 791, 797–98, 794 S.E.2d 535, 539 (2016).

Fed. R. Civ. P. 56(g), Notes of Advisory Committee on 2010 Amendments to Federal Rules of Civil Procedure (Advisory Committee Notes) (emphasis added).

15. Federal Rule 56(g), like North Carolina Rule 56(d), "was intended to avoid a useless trial of facts and issues over which there was never really any controversy and which would tend to confuse and complicate a lawsuit." *Flexible Lifline Sys. v. Tollenaere (In re Tollenaere)*, 2012 Bankr. LEXIS 4780, at \*8 (Bankr. D.S.C. Oct. 10, 2012) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n. 3 (9th Cir. 1981)). Notwithstanding this goal, the Committee Notes expressly contemplate that sometimes the costs associated with summary disposition may, in fact, be greater than allowing the entire case to proceed to trial. Therefore, the decision whether to grant relief pursuant to Federal Rule 56(g) is firmly within the trial court's discretion.

16. In light of these principles, the Court considers NDCO's Rule 56(d) Motion under a discretionary standard.

### III. ANALYSIS

17. As an initial matter, the Court acknowledges that the Court's consideration of the Rule 56(d) Motion only becomes necessary if the Court concludes that summary judgment is inappropriate.[2] N.C.G.S. § 1A-1, Rule 56(d) ("If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court . . . shall if practicable ascertain what material facts exist without

---

[2] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c).

substantial controversy . . . ."). In addition to the Court's consideration of NDCO's Rule 56(d) Motion at the September 18, 2019 hearing in this matter, it also considered and heard oral argument from counsel on the Cross-Motions.

18. Based upon the briefs and materials submitted by the parties, the arguments of counsel, and the matters of record properly considered by the Court on the Cross-Motions brought pursuant to Rule 56, the Court concludes that there are genuine issues of material fact as to each issue before the Court on the Cross-Motions, and therefore summary adjudication of any of the parties' claims is inappropriate at this time. The Court intends to detail its reasoning and conclusions on the Cross-Motions in a separate order and opinion. However, in the interests of judicial efficiency, the Court enters this Order and Opinion on the Rule 56(d) Motion to assist counsel in their preparation for trial.

19. Upon receipt of NDCO's Rule 56(d) Motion, the Court first gave NDCO, as the movant, the opportunity to prepare a statement of facts that they contended existed without controversy. Thereafter, the Court gave PFD/Trask the opportunity to respond to NDCO's statement of facts and supplement the record where it disagreed with NDCO's recitation. This procedure was implemented to assist the Court in its understanding of what facts were considered to be "material" to the issues presented in this litigation and which of those material facts were not in good faith controverted.

20. The record in this case is voluminous. Independent of their arguments on the Cross-Motions, the parties submitted over 2,500 pages of documents for the

Court's consideration of the Rule 56(d) Motion. NDCO's Revised Statement of Uncontroverted Facts contains a list of 239 purported facts with corresponding record citations. PFD/Trask provided a response to each of these facts, indicating where they agreed with NDCO's assessment and where they disagreed, with corresponding record citations in support of that contrary position. The Court's undertaking here, therefore, is much more expansive than the assessment of the thirty-three (33) arguably disputed facts that were before the trial court in *Challenge.* Nonetheless, the Court considers each of NDCO's 239 facts, and PFD/Trask's responses thereto, and concludes that the following facts exist without substantial controversy. In making these determinations, the Court does not find a fact to be uncontroverted if the Court concludes there is cognizable evidence of record contrary to NDCO's contention.[3]

## IV. MATERIAL FACTS THAT EXIST WITHOUT SUBSTANTIAL CONTROVERSY[4]

21. Pender 1164 is a limited liability company, organized and existing under the laws of the State of North Carolina, that was created for the purpose of owning and developing 1,164 acres of real property in Pender County, North Carolina (the

---

[3] NDCO has also asked the Court to find as "uncontroverted" provisions in various agreements between the parties and other related non-parties. The Court declines to add the contents or provisions of any agreement as an uncontroverted fact, as these documents speak for themselves and, to the extent they are relevant to the issues and otherwise admissible, the agreements may be introduced as exhibits at trial.

[4] In an order on a motion for summary judgment, North Carolina law is clear that "the trial could should not make findings of fact, which are decisions upon conflicting evidence." *A-S-P Associates v. Raleigh*, 38 N.C. App. 271, 275, 247 S.E.2d 800, 803 (1978) (reversed on other grounds). Instead, pursuant to Rule 56(d), the trial court is entitled to set forth a list of undisputed material facts. *Id.* This list is limited, therefore, to those facts that the parties agree are uncontroverted or the record otherwise discloses are not in dispute.

"Pender 1164 Project"). (Trask Aff. ¶ 5, ECF No. 43.) PFD and NDCO each own a fifty percent (50%) ownership interest in Pender 1164. (Trask Aff. ¶ 5, ECF No. 43.)

22. Trask is a real estate developer in the Wilmington area. (Trask Aff. ¶ 3, ECF No. 43.) His experience developing real estate began in 2005. (Trask Dep. 11:9–13, ECF No. 110.10.) Trask's 2011 website advertised that Trask offered a "full range of development services," including development, pro-formas, analysis, marketing, and rezoning. (Trask Dep. 46:1–47:3, ECF No. 110.10.)

23. With regard to what eventually became known as Pender 1164, Trask was first approached by Steven Shuttleworth ("Shuttleworth") about being involved in a development project. (Trask Dep. 66:25–68:4, ECF No. 110.10.) Shuttleworth had been a part of a group that had owned 1800 acres of property in Pender County, which consisted of the 1164 acres now owned by Pender 1164. (Shuttleworth Dep. 12:4–19, ECF No. 100.11.)

24. The property owned by Pender 1164 was more hydrologically complex than Trask's previous projects. (Trask Dep. 102:7–18, ECF No. 100.10.)

25. Shuttleworth's group had performed environmental assessments on the property, with a belief at the time of the original master plan that a total of 2400 units/lots could be obtained from the 1800 acres. (Shuttleworth Dep. 60:9–14, ECF No. 100.11.)

26. Trask agreed to advance "soft costs" for the Pender 1164 Project. (Trask Dep. 71:22–72:9, ECF No. 100.10.)

27.     During the "due diligence" period set forth in the Joint Venture Agreement, Trask realized that the costs of development would be more expensive than anticipated and he did not want to "pay any cash out of [his] pocket." (Trask Dep. 69:5–71:23, ECF No. 100.10.)

28.     Trask did not instruct Shuttleworth to inform Mike Cook or any member of the Land Bank group that the structure of the deal had to change because of his beliefs regarding increased costs. (Trask Dep. 141:24–142:9, ECF No. 100.10.)

29.     There are no written communications in the period after the execution of the Joint Venture Agreement, and prior to the execution of either the original Operating Agreement or the Amended Operating Agreement, that demonstrates any belief on Trask's part that there were going to be significant increases in the development costs. (*See* Trask Dep. 143–44, 148–49, ECF No. 100.10.)

30.     Trask undertook a redesign of the proposed project in the Spring of 2015. (Trask Dep. 105:24–106:23, ECF No. 100.10.)

31.     When construction of the first phase was placed out for bid, Trask was informed that the cost of construction was "extremely high, say $10,000 a lot over what we needed to be." (Trask Dep. 106:7–13, ECF No. 100.10.)

32.      Between the execution of the Amended Operating Agreement and 2015, no mention was made by Trask of any need for development financing. (Trask Dep. 227:10–19, ECF No. 100.10.)

33.     Shuttleworth, after the execution of the Joint Venture Agreement and prior to the execution of the original Operating Agreement, had communicated with the

Land Bank Group that the estimated development cost per lot was approximately $20,000.  (Shuttleworth Dep. 82:5–83:7, ECF No. 100.11.)

34.    The purpose of the Development Agreement, which was between PFD as Developer and Pender 1164 as Owner, and was signed by Trask, was to set forth PFD's obligations under the Operating Agreement and is the "separate agreement" with Pender 1164 referenced in the original Operating Agreement and Amended Operating Agreement.  (Trask Dep. 177:21–178:6, ECF No. 100.10; Development Agreement, ECF No. 64.1.)

35.    Trask never provided NDCO with a copy of the Development Agreement until after the lawsuit was filed.  (Trask Dep. 178:19–22, ECF No. 100.10.)

36.    Trask provided a copy of the Development Agreement to prospective lenders from which PFD sought financing.  (Trask Dep. 180:1–17, ECF No. 100.10.)

37.    Trask instructed Shuttleworth to work with the owners of the adjacent 664 acres to incorporate that adjacent 664 acres into the Joint Venture.  (Trask Dep. 124:3–12, ECF No. 100.10.)

38.    Shuttleworth sent an email to Mark Holm and Sandy Christian on August 6, 2013, in which Shuttleworth explained his understanding of the concept under which Trask was then operating and attached both a letter addressed to Mark Holm and a "Joint Venture Overview."  (Ex. C to NDCO's List of Exhibits, ECF No. 64.3.)

39.    Trask was copied on Shuttleworth's August 6, 2013 email.  (Ex. C. to NDCO's List of Exhibits, ECF No. 64.3.)

40. How the entitlement and development expenses were going to be paid was a material provision of the Operating Agreement. (Trask Dep. 125:8–14, ECF No. 100.10.)

41. Trask never made contact with Sandy Christian to correct anything that had been represented by Shuttleworth in his August 6, 2013 email. (Christian Dep. 67:5–8, ECF No. 100.12.)

42. After discussions with Trask and receipt of the proposed Amended Operating Agreement, Mark Holm told Sandy Christian and her father, Al Eide, that his understanding of the agreement was that the land would be developed by a developer, Trask Development. As the property was developed and the property was sold, the developer would receive its costs back first, then the remaining net proceeds would be paid fifty percent to the developer and fifty percent to the landowners. (Holm Dep. 34:22–35:13, ECF No. 100.13.)

43. Shuttleworth's understanding of the concept under which Trask was operating pursuant to the Operating Agreement was that Trask was to pay all the development and entitlement costs, be reimbursed for them, and then everything was to be split 50/50. (Shuttleworth Dep. 86:1–5, ECF No. 100.11.)

44. Trask never informed Sandy Christian that Trask/PFD would have no obligation to pay for any entitlement and development expenses. (Christian Dep. 70:12–19, ECF No. 100.12.)

45. From and after the execution of the Amended Operating Agreement and until the Spring of 2016, Trask paid for the entitlement and development services

and provided quarterly reports to NDCO. (*See* Quarterly Reports, Ex. H to NDCO's Index of Exhibits in Support of MSJs, ECF No. 100.9.)

46. No mention had been made in any of the Quarterly Reports provided by Trask that moving forward with the development was contingent upon Trask being able to obtain a loan and secure that loan with as much of Pender 1164's property as a bank may require. (*See* Quarterly Reports, Ex. H to NDCO's Index of Exhibits in Support of MSJs, ECF No. 100.9.)

47. Trask considered moving the Waste Water Treatment Facility to an adjacent property. (Trask Dep. 160:3–23, ECF No. 100.10.)

48. Trask represented to NDCO that there were liability and costs associated with the SGI ponds. (Christian Dep. 43:25–44:6, ECF No. 100.12.)

49. Trask's understanding of the provisions of the Amended Operating Agreement allowed him to pursue other opportunities. (Trask Dep. 153:3–15, ECF No. 100.10.)

50. Trask informed NDCO that there was no cost recovery for the property transferred to Pluris for the construction of the Waste Water Treatment Facility. (Trask Aff. ¶ 42, ECF No. 43.)

51. On April 28, 2015, Craig Muhl, on behalf of the Land Bank Group, gave Trask permission to make contact with Stockmens Bank in regard to the development loan. (Ex. E to Alexander Aff., ECF No. 95.6.)

52.     On January 19, 2016, Trask emailed Robert M. Alexander at Stockmens Bank about subordination.  (Ex. B to Muhl Aff., ECF No. 100.2.)  That same day, Robert M. Alexander responded. (Ex. H to Alexander Aff., ECF No. 95.9.)

53.     Trask informed South State Bank that he had been approached by a group of investors that had purchased the property owned by Pender 1164, and he had partnered together with them, and his responsibility was to develop the lots.  (Aiken Dep. 66:5–19, ECF No. 100.14.)

54.     Trask informed South State Bank that the group offered Trask fifty percent ownership in Pender 1164, provided that Trask develop the land and that South State Bank, therefore, assumed that Trask had an obligation to develop the land in exchange for his fifty percent ownership.  (Aiken Dep. 88:4–89:24, ECF No. 100.14.)

55.     When Trask sought a loan from South State Bank, he made the specific request that the borrower be PFD.  (Ex. C to NDCO's Index of Exhibits in Support of MSJs, ECF No. 100.4.)

56.     Trask informed South State Bank that the Stockmens Bank would not agree to be paid after South State Bank was paid in full.  (Aiken Dep. 90:12–92:11, ECF No. 100.14.)

57.     Regardless of that knowledge, the South State Bank commitment letter was going to require that to be the case.  (Aiken Dep. 92:21–22, ECF No. 100.14.)

58.     On April 27, 2016, Mike Cook informed Trask that the commitment letter required South State Bank to receive all proceeds until paid in full prior to Stockmens Bank's receipt of anything and informed Trask that he did not see how Stockmens

Bank would sign off on this arrangement. (Ex. 23 to PFD/Trask's Index of Exhibits in Support of their MSJ, ECF No. 92.23.)

59. In the spring of 2016, Trask had a telephone conversation with Sandy Christian and Mark Holm about the South State Bank loan proposal. (Christian Dep. 72:14–73:6.)

60. South State Bank required an appraisal with a maximum appraised value of sixty-five percent loan to value for its loan. (Aiken Dep. 35:13–14, ECF No. 100.14.)

61. South State Bank knew that the proposed Blake Farm project was the largest single-family residential project that Trask had been involved in, which was one of the reasons it required Raiford Trask, Jr. to guarantee the loan. (Aiken Dep. 43:1–13, ECF No. 100.14.)

62. There is no mention in any agreement with NDCO of any requirement that Stockmens Bank subordinate the lien of its Deed of Trust. (Trask Dep. 76:24–78:3, ECF No. 100.10.)

63. On June 16, 2016, Trask submitted a letter to Mike Cook regarding the Pender 1164 Project. (Ex E. to Compl., ECF No. 2.)

64. Trask could have obtained financing for PFD without using Pender 1164's property as collateral, but Trask stated it was "outside of our risk/earnings ratio to do so." (Ex. F to Compl., ECF No. 2.)

65. The cost-sharing associated with the construction of Blake Farm Boulevard was a source of disagreement between Trask, Mike Cook, and Sandy Christian. (Trask Dep. 27:4–18, ECF No. 100.10.)

66. For approximately one year after the declaration of the deadlock, Trask kept developing the property owned by Pender 1164. (Trask Dep. 165:13–16, ECF No. 100.10.)

67. After Trask's declaration of a deadlock, beginning in October of 2016, Trask sought financing from Bank of North Carolina. (Williard Dep. 47:10–48:11, ECF No. 100.15.)

68. Trask informed Bank of North Carolina that he was seeking a loan to develop 88 lots, 50 undeveloped lots, and Blake Farm Boulevard. (Williard Dep. 59:10–16, ECF No. 100.15.)

69. Trask provided construction budgets, and those budget projections appeared to be reasonable to Christopher Williard. (Williard Dep. 138:22–25, ECF No. 100.15.)

70. Trask informed Christopher Williard of NDCO's problem with Bank of North Carolina's collateral requirements. (Williard Dep. 59:23–60:6, ECF No. 100.15.)

71. Christopher Williard was aware that NDCO had problems with there being no cost-sharing of Blake Farm Boulevard. (Williard Dep. 59:23–60:6, ECF No. 100.15.)

72. The proposal provided by Bank of North Carolina required 139 acres of collateral, more than the area that would be under development. (Williard Dep. 80:6–13, ECF No. 100.15.)

73.     On or about October 31, 2016, Bank of North Carolina provided a loan term sheet naming PFD (not Pender 1164) as the borrower.  (Williard Dep. 81:12–14, ECF No. 100.15.)

74.     As of October 31, 2016, Trask/PFD had $555,027.00 in entitlement and development expenses advanced on the Pender 1164 Project.  (Williard Dep. 97:13–19, ECF No. 100.15.)

75.     Bank of North Carolina's primary source of repayment for a loan was to be Pender 1164's property and the sale thereof, and not the resources of Trask, as a borrower.  (Williard Dep. 106:4–22, ECF No. 100.15.)

76.     Trask has never contributed the property that comprises the access to Pender 1164, but stated that it was a value secured for the benefit of Pender 1164.  (Trask Dep. 130:7–131:7, ECF No. 100.10.)

77.     The access to Pender 1164 is not currently a capital contribution of PFD.  (Trask Dep. 130:10–12, ECF No. 100.10.)

## V.     CONCLUSION

78.     THEREFORE, based upon the Court's exercise of the mandate of Rule 56(d), and without determining their relevance or admissibility, the foregoing material facts exist without substantial controversy and are deemed established for purposes of the trial of this matter.  Except as expressly set forth above, all other purported material facts are actually and in good faith controverted.

**SO ORDERED**, this the 6th day of November, 2019.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases